GRACE & CO. (Pacific Coast), a corporation, Appellant,

v.

CITY OF LOS ANGELES, a municipal corporation, Appellee.

No. 16388.

United States Court of Appeals
Ninth Circuit.

April 14, 1960.

McCutchen, Black, Harnagel & Shea, Philip K. Verleger, Howard J. Privett, Los Angeles, Cal., Jack T. Swafford, Los Angeles, Cal., for appellant.

Roger Arnebergh, City Atty., Arthur W. Nordstrom, Asst. City Atty., C. N. Perkins, Walter C. Foster, Deputy City Attys., Los Angeles, Cal., Trippet, Yoakum, Stearns & Ballantyne, F. B. Yoakum, Jr., Los Angeles, Cal., of counsel, for appellee.

Before BARNES, HAMLIN and JERTBERG, Circuit Judges.

HAMLIN, Circuit Judge.

This is a diversity action brought in the District Court for the Southern District of California by Grace & Co., a West Virginia corporation, appellant, against the city of Los Angeles, a municipal corporation, appellee, for damages to certain bags of coffee owned by appellant which had been unloaded from a ship and were in a shed at Berth 59 in Los Angeles Harbor. The basis of appellant's claim for damages is the alleged negligence of the city of Los Angeles.[1]

The District Court had jurisdiction by virtue of 28 U.S.C.A. § 1332, and this Court has jurisdiction under 28 U.S.C.A. § 1291. The action was tried to the Court without a jury.

The background of the case as disclosed by the evidence, the findings of the Court and the stipulation of the parties is set out below.

The city of Los Angeles, through its Harbor Department, operated a transit shed at Berth 59, Pier 1, Los Angeles Harbor. This pier extended southerly and seaward from 22nd Street about 2,400 feet into the harbor waters. A steel and concrete transit shed on this pier was used for the receipt and shipment of goods to and from Los Angeles Harbor.

Running generally the length of Pier 1 and in the middle of it was Signal Street. West of Signal Street was the transit shed and west of the transit shed were Berths 57 to 60. Westerly of these berths was the east channel of the harbor. Under Signal Street there was a 10-inch water main operated by the Water and Power Department of the City of Los Angeles; this main consisted of 5,244 feet of cast iron pipe which had been laid by the Water Department. Paralleling the Water Department's 10-inch main was an 8-inch main, which was installed and maintained by the Harbor Department of the City of Los Angeles. This 8-inch Harbor Department main was connected at three places with the Water Department's 10-inch main, which, through check valves, supplied the 8-inch main with water. Both the 10-inch main and the 8-inch main were laid around 1914, although probably not at the exact same time. Two laterals ran from the 8-inch main to each of Berths 57 to 60. The 8-inch main and laterals were operated solely for the purpose of providing water for fire fighting and fire prevention. The water from the 8-inch main was not used for toilets, washrooms, drinking fountains, or any purpose other than servicing fire hoses and a fire protection sprinkler system.

On March 12, 1956, the more northerly of the two laterals leading from the 8-inch main to Berth 59 burst at a point under a concrete loading platform just to the east of the shed. The pipe was

---

1. The opinion of the District Court is reported at 168 F.Supp. 344.

buried 9 to 10 feet underground and covered with a compacted dirt fill which supported the loading platform.

A large quantity of water escaped from the 8-inch lateral under a pressure of approximately 65 pounds per square inch, flooded the floor of the shed at Berth 59, and caused the damage to appellant's coffee.

It appears from the testimony of experts that the failure of the pipe was due to graphitic corrosion. The pipe in question is called sand cast or sand molded cast iron pipe. In the process of manufacturing, molten sand forms a hard skin on the surface of the pipe. Experts testified that if this skin is broken during transportation or installation, corrosion may start at the break. The skin may be broken by a blow from a hard object or in many other ways, and is quite common. Once corrosion starts, its rate of progress depends on the corrosivity of the soil.

The corrosivity of soil apparently depends on the extent to which salts are present. In the presence of an electrolyte such as water and any of the salts which are present in earth and water to varying degrees, a small battery is formed between the small particles of carbon and iron in the pipe. As the current flows, the iron goes into solution, leaving the carbon in its original position. This process does not change the shape or contour of the pipe, but it has the effect of weakening the pipe so that it may rupture.

The expert testimony showed that an examination of the pipe might not disclose any defect at the point examined, although a foot away graphitic corrosion might be taking place.

At the time the pipe was installed in 1914 very little was known about corrosivity of soil and its effect upon cast iron pipe. At that time the pipe in question was the best obtainable on the market. Commencing about 1935, testing of soil for corrosivity was done in various places by the United States and by some companies.

An employee of the Water Department of Los Angeles testified that similar tests were made by the Water Department of Los Angeles. These were continued from time to time, and, beginning about 1935, when new pipe lines were to be laid or old pipe to be replaced by the Water Department, corrosivity tests of the soil along the pipe location were made. In corrosive soils, new cast iron pipe was protected by an outer covering designed to prevent or reduce corrosion.

Tests had been made by the Water Department in the general area of Signal Street and some adjacent land, and it had been found that the soil in the places tested was severely corrosive. While the results of these tests were furnished to such persons as asked for them, it was not shown that the Harbor Department had any knowledge of them or that they were ever communicated in any way to the Harbor Department.

The testimony showed that there was no uniform pattern of corrosivity. Some soils in the interior were more corrosive than those found on the waterfront. Corrosivity depended in part upon where the soil used in the fill came from.

Experts estimated the life of cast iron pipe in soil having a high corrosivity as from 10 to 20 or 25 years, but it was conceded that there was no high precision to such an estimate. There was testimony that pipe has been known to fail within as short a time as two years, and evidence of one instance where cast iron pipe was still in service after more than one hundred years in highly corrosive soil. There was also testimony that in Philadelphia cast iron pipe was still in service which had been installed approximately 150 years ago.

The evidence showed that it was not the policy of the city of Los Angeles to dig up and replace the water lines at any particular time, but that this was only done when a leak occurred and water was discovered on the surface of the ground.

Appellants contend that appellee was negligent in maintaining the pipe lines without ascertaining whether the pipe was of sufficient strength to withstand

the applied pressure, and that the pipe was of such an age as under existing conditions to render it unsafe for the purpose intended.

■ The appellant had the burden of establishing the negligence of the appellee. The District Court found against the claims of the appellant and found that appellee was not negligent. There was ample evidence to support this finding.

The Harbor Department has in the area something over ten miles of water lines. The testimony was that in order to determine whether there was corrosion in the pipes, every inch of the pipe would have had to be examined. This includes the top, bottom and the sides.

The District Judge in his memorandum opinion stated [168 F.Supp. 348]:

"According to the testimony of experts, graphitic corrosion occurs sporadically. Graphitic corrosion may occur on the top of the pipe and not on the bottom, or on one side and not the other. Graphitic corrosion may occur in one spot and then may not occur for many feet along the line. It would be necessary to excavate around the entire pipe to locate a corroded area. An examination of the upper half of the pipe would not be sufficient because graphitic corrosion could manifest itself on the lower portion of the pipe and not on the top or sides. To make complete inspection it would be necessary to remove the earth from beneath the line. The removal of earth from beneath the pipe would remove its support, putting a strain upon the pipe itself, and might cause a sinking or bending of the pipe, occasioning damage more extensive than the corrosion itself."

Paralleling and adjacent to the Harbor Department's 8-inch main under Signal Street, the Water Department of the City of Los Angeles had something over 5,000 feet of sand cast pipe. The record shows that since its installation in about 1914 there was only one rupture in this pipe and that was in 1949. Other than this one occasion, there was no trouble with this pipe. There was testimony that there had been some breaks in the Water Department pipe on 22nd Street, which runs at right angles to Signal Street on the land side. This pipe was installed in 1934 and the breaks occurred between 1940 and 1942. However, it was shown that this pipe was metal molded pipe, which does not hold up as well as the sand cast pipe used by the Harbor Department. Prior to the break in question, there had been but one corrosion failure of Harbor Department pipe in the area, and this in 1926.

At the place of the break a piece of pipe six or seven feet long was removed and a hole on the bottom approximately the size of a hand was found. It was through this hole that the water had escaped. The rest of the pipe in that area was good. It was claimed that a piece of pipe close to where the break occurred was removed and subjected to over 500 pounds pressure before it failed.

No expert testified that it was the practice in any municipality to dig up underground pipe to ascertain its condition, no matter when it was installed. To the contrary, there was testimony that if any policy had been adopted in other municipalities in California, it was, as in Los Angeles, that after installation of the cast iron water pipe it was used without inspection or replacement until there were sufficient breaks to indicate the pipe had corroded or become undependable.

■ Observance of a custom or practice is evidence of due care, although of course it does not conclusively establish the legal standard. Williams v. City of Long Beach, 1954, 42 Cal.2d 716, 268 P.2d 1061; Prosser on Torts (1955 ed. § 32) 135. See also Polk v. City of Los Angeles, 1945, 26 Cal.2d 519, 159 P.2d 931; Sheward v. Virtue, 1942, 20 Cal.2d 410, 126 P.2d 345.

The meters showed that for some months prior to the failure in question there had been a considerable flow of

water into the system. The rate of flow was variable, but averaged about 140 cubic feet a day. As this was a "dead-end" system and its sole purpose was to provide water for fighting fires, appellant claims the City should have made a thorough investigation, in the interest of safety, to determine the cause of the flow or loss of water.

However, the meter readings do not indicate that any water was escaping from the pipe at the point where it burst. The evidence of the experts indicates that if there was a failure by reason of graphitic corrosion that there would have been a flood of water, such as occurred, rather than gradual leakage, which does not necessarily indicate a corrosion failure. Further, in the absence of water coming to the surface the source of the leak could not be found without digging up the pipe.

The evidence indicates a number of possible explanations for the flow. The fire line involved was approximately 5,000 to 6,000 feet long, containing a leaded joint every ten feet. Water could be lost through leaks in these joints or through various valves in the line.

We have not attempted to set out above all of the evidence in the case, but we believe that enough has been set out to show that there was ample evidence to support the finding of the District Judge that there was no negligence on the part of the City.[2]

Appellant contends that appellee was acting in its proprietary capacity as a warehouseman and that its conduct should be determined by the standard of care required of a warehouseman. United States v. Certain Parcels of Land in Los Angeles County, D.C.S.D.Cal.1945, 63 F.Supp. 175, 184–186. Under Lawrence Warehouse Co. v. Defense Supplies Corporation, 9 Cir., 1947, 164 F.2d 773, reasonable care under the circumstances is required of a warehouseman. Operation of a municipal water system is also said to be a proprietary activity. Nourse v. City of Los Angeles, 1914, 25 Cal.App. 384, 143 P. 801; City of Richmond v. Virginia Bonded Warehouse Corp., 1927, 148 Va. 60, 138 S.E. 503, 54 A.L.R. 1485.

Appellee contends that it was acting in a governmental capacity, inasmuch as the water line in question was used only for fire prevention purposes. Chafor v. City of Long Beach, 1917, 174 Cal. 478, 163 P. 670, L.R.A.1917E, 685; Stang v. City of Mill Valley, 1952, 38 Cal.2d 486, 240 P.2d 980. It contends that its liability is measured by California Government Code, §§ 53050 and 53051.[3] Hoel v. City of Los Angeles, 1955, 136 Cal.App. 2d 295, 288 P.2d 989; Dineen v. City and County of San Francisco, 1940, 38 Cal.App.2d 486, 101 P.2d 736.

The District Court found on this issue in accordance with the contentions of ap-

2. See generally A. J. Brown & Son v. City of Grand Rapids, 1933, 265 Mich. 465, 251 N.W. 561; Philadelphia Ritz Carlton Co. v. City of Philadelphia, 1925, 282 Pa. 301, 127 A. 843; Republic Light & Furniture Co. v. City of Cincinnati, 1954, 97 Ohio App. 532, 127 N.E.2d 767; Taphorn v. City of Cincinnati, 1953, 96 Ohio App. 454, 122 N.E.2d 307; City of Richmond v. Hood Rubber Products Co., 1937, 168 Va. 11, 190 S.E. 95; Midwest Oil Co. v. City of Aberdeen, 1943, 69 S.D. 343, 10 N.W.2d 701; A. Da Prato Company v. City of Boston, 1956, 334 Mass. 186, 134 N.E.2d 438; Stein v. City of Newark, 52 A.2d 66, 25 N.J.Misc. 170 (Cir.Ct. of Essex Co. N.J., 1947); Yearsley v. City of Pocatello, 1949, 69 Idaho 500, 210 P.2d 795.

3. § 53050. Definitions
As used in this article:
" * * * (c) 'Local agency' means city, county, or school district. * * * "
"§ 53051. Injuries from dangerous or defective condition of public property, basis of liability
"A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:
"(a) Had knowledge or notice of the defective or dangerous condition.
"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

pellee. We hold that under either view the District Court's finding of no negligence on the part of appellee, supported as it is by ample evidence, is dispositive of the issue of liability.

█ One further specification of error is made by appellant. It appears that certain interrogatories were propounded to the appellee by the appellant pursuant to Rule 33 of the Rules of Civil Procedure, 28 U.S.C.A. Appellee's original answer to Interrogatory No. XIV(b) was put in evidence by appellant. This answer stated in part that the Harbor Department had experienced a failure of cast iron water pipe due to corrosion on two specific occasions—one approximately fourteen years after its installation and the other approximately fifteen years after its installation. Some seven months later, but about fifteen months prior to the trial, appellee filed additional answers to the interrogatories in which a correction was made, claiming that the two breaks covered by its answers to Interrogatory XIV were *not* caused by corrosion.

Appellant introduced in evidence the first answers made by appellee, but objected to admission into evidence of appellee's corrected answers on the ground that they were "self-serving." On appellee's suggestion, the District Court had the additional answer read, and denied appellant's motion to strike.

Normally, a party may not introduce his self-serving answers to an opponent's interrogatories. Haskell Plumbing & Heating Co. v. Weeks, 9 Cir., 1956, 237 F.2d 263, 267, 16 Alaska 436. However, as appellee's original answer was introduced by appellant, appellee was entitled to read any other answer which tended to explain or correct it. Cf. RCA Manufacturing Co. v. Decca Records, Inc., D.C.S.D.N.Y.1940, 1 F.R.D. 433; McInerney v. Wm. F. McDonald Construction Co., D.C.E.D.N.Y.1940, 35 F.Supp. 688; 4 Moore's Federal Practice (1950 ed.) § 33.29(2).

The judgment is affirmed.