**I. M. OF ATLANTIC CITY,**
**Plaintiff,**

v.

**DISTRICT OF COLUMBIA, Defendant.**
**Civ. A. No. 2192–68.**

United States District Court,
District of Columbia.
March 21, 1973.

Philip R. Collins, Urban A. Lester, Washington, D. C., for plaintiff.

Walter J. Smith, Jr., Asst. Corp. Counsel, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

FLANNERY, District Judge.

This civil action is a non-jury suit for property damage sustained by the plaintiff caused by the alleged negligence of the defendant due to a broken water main which resulted in the plaintiff's basement being flooded, causing extensive damage to the plaintiff's business establishment, i. e., fixtures, furniture and stock of goods. The issues of liability and damages have been bifurcated, the court having received evidence only on the issue of liability.

The plaintiff is a Delaware corporation transacting business in the District of Columbia under the name of I. Miller at 1222 F. Street, N.W. Defendant is a municipal corporation existing under the laws of the United States. The District of Columbia Water Operations Division of the Department of Sanitary Engineering was a division of the District of Columbia during the occurrences giving rise to this action. Plaintiff alleges defendant's liability based on: (1) Defendant's negligence in failing to properly install and maintain a water main of proper quality, defendant having actual or constructive notice that the pipe was of poor quality and that a break might occur; and (2) Defendant's negligence in failing to take prompt, timely and reasonable action to stem the continuous flow of water from the broken water line, defendant having actual or constructive notice that the break would cause extensive flooding in the basement of plaintiff's store. For the reasons noted below, this court enters judgment for defendant, District of Columbia, on both counts.

### I. Negligence in Installation and Maintenance of Water Main of Proper Quality

Plaintiff relies on the doctrine of res ipsa loquitur to bolster its position that defendant is liable for negligently installing and maintaining the water main in question. Other jurisdictions are not in accord regarding the applicability of res ipsa loquitur in an action against a municipality for damage caused by water from a bursting water main. For example, in New York, Idaho, and California the view appears to be that the doctrine is available; see, e. g., Bierman v. Consolidated Edison Co., 66 Misc.2d 237, 320 N.Y.S.2d 331 (1970); C. C. Anderson Stores Co. v. Boise Water Corp., 84 Idaho 355, 372 P.2d 752 (1962); Amavisca v. Merced, 149 Cal.App.2d 481, 308 P.2d 380 (1957); while in other states, such as Massachusetts, New Jer-

sey, and Michigan the doctrine does not appear to be available; see, e. g., Goldman v. City of Boston, 274 Mass. 329, 174 N.E. 686 (1931); Fanning v. Montclair, 81 N.J.Super. 481, 196 A.2d 18 (1963); A. J. Brown & Son, Inc. v. Grand Rapids, 265 Mich. 465, 251 N.W. 561 (1933). In the District of Columbia, the issue arose in Ford v. District of Columbia, 190 A.2d 905 (D.C.C.A. 1963). There Chief Judge Hood decided that the fact that damage results from a broken water main which is municipally controlled does not in and of itself render the doctrine available. Rather, he held that the imposition of the doctrine in a particular case must be governed by the facts presented. The question is whether those facts as set forth by a plaintiff meet the general requirements for the invocation of the doctrine as laid out by District of Columbia cases spanning a wide range of fact patterns. Id. at 906. The court's position in *Ford* seems eminently reasonable.

In Smith v. Reitman, 128 U.S.App.D. C. 352, 389 F.2d 303 (1967), Judge (now Chief Justice)Burger explained the res ipsa loquitur doctrine as follows: "The *doctrine is a common sense rule which allows an inference of negligence where the occurrence complained of ordinarily would not happen in the absence of neg*ligence. For this doctrine to be invoked, however, there must be some basis in the record or in common experience to warrant the inference that the result would not have occurred without some negligent act." *Id.* at 304, citing Quick v. Thurston, 110 U.S.App.D.C. 169, 172, 290 F.2d 360, 363 (1961). This position is reflected in earlier opinions. See Ford v. District of Columbia, *supra*; Washington Loan and Trust Co. v. Hickey, 78 U.S.App.D.C. 59, 137 F.2d 677 (1943); Lazarus v. Eastern Air Lines, Inc., 110 U.S.App.D.C. 255, 257, 292 F. 2d 748, 750 (1961); Slaughter v. D. C. Transit, 104 U.S.App.D.C. 275, 261 F.2d 741 (1958); Kight v. Metropolitan Railroad Co., 21 App.D.C. 494, 508 (1903).

See also Prosser on Torts, § 39, at 211 (4th ed. 1971). In *Ford, supra,* Judge Hood stated, "if causes other than the defendant's negligence might have produced the accident, the plaintiff must exclude those other causes by a preponderance of evidence." 190 A.2d at 907. In Washington Loan and Trust Co. v. Hickey, *supra,* the court, speaking of the doctrine said, "when the cause of an accident is (1) known, (2) in the defendant's control, and (3) unlikely to do harm unless the person in control is negligent, the defendant's negligence may be inferred without additional evidence." *Id.* at 61 of 78 U.S.App.D.C., 137 F.2d at 679. Thus, in the case now before the court the question presented is whether the plaintiff has by a preponderance of the evidence eliminated all causes of the broken main except defendant's negligence. The court believes it has not.

From the evidence presented, the court as fact finder finds the following facts relevant to the allegation of negligence in the installation and maintenance of the main in question. There are approximately 1350 miles of water main pipe in the District of Columbia. Ninety-nine percent of these pipes are pit cast "grey iron" cast iron pipe. As of the date of the occurrence, roughly fifty percent of this system was installed prior to 1900 with the oldest main, a system running in front of the White House, being installed in 1858. In the 1858 main there have been no breaks due to age, deterioration, or soil erosion. The main in question was six inches in diameter, ran along F Street, and was installed in 1896. Although the pit casting technique dates back to the Bronze Age, the expected life span of cast iron pipe is over 120 years. The oldest pit cast grey iron system still in use in the world was built in 1664 by King Louis of France and is located in Versailles. The average age of water mains in the District of Columbia system is seventy-five years. At the time the main in question was laid there were no uniform standards for cast iron

mains.[1] Although centrifugal casting,[2] a newer casting method, came into use after 1920, there is no difference between pit cast and centrifugal cast pipe insofar as resistance to corrosion is concerned. Pitometer tests,[3] testing the integrity of the system, were conducted on the main in question at various intervals since 1943 with the most recent test prior to the December 5, 1966 break being conducted in February, 1965, less than one year earlier. The testing method employed had the ability to reveal leaks as small as two gallons per minute, but the tests on the main in question showed no indication of leaks.

Expert testimony disclosed that a study of main breaks over the life span of the main leads to several conclusions: (1) Bad bedding, settlement of the earth, and manufacturing defects show up in the first ten years of the main's life i. e. there is a high instance of failure in the first ten years; (2) If a main passes through these first ten years without failure, it usually remains trouble free until age thirty to fifty. During this period, if the main was laid in corrosive soil, cinder soil, or electrolysis has been occurring due to the proximity of trolly tracks, these defects will appear; (3) After the main has passed through "middle age", it is reasonable to assume that the main has good bedding, that its original manufacture was good, and its environment is nondestructive. Except for failures attributable to crossings of other utilities, or exposure of the main to damage such as recently occurred during the excavation for the Metro subway system, very few failures appear in the water main after middle age.

The exact cause of the break in question has not been demonstrated. However, evidence did show that the break was a circumferential break, the type where the main shears around the periphery of the pipe. Testimony disclosed that circumferential breaks occur in old and new mains during all seasons of the year and are caused by earth pressures on one section of pipe becoming uneven with earth pressures on another section of the same pipe so that the heavier pressure "shears" the main even as uneven hand pressure will "shear" a wooden pencil. The reason the break sheared where it did may have been due to a combination of galvanization, (the effect of soil acidity), electrolysis, (the effect of strong electrical currents), age, and abrupt changes in weather conditions.

The District of Columbia averages 200 breaks per year. Of these, 150 to 175 of the breaks are caused by other than obvious causes such as construction excavation, a rate which compares favorably with other large cities. The history of the six-inch main in question reveals that in 1963 there was a circumferential break in the 1200 block of F Street, N.W., caused by shear pressure forces and not due to the age of the main.

The city has no periodic inspection program because by digging to the pipes not only would it incur a heavy expense

1. The first water main standards were published by the New England Water Works Association in 1902. In 1908, the American Water Works Association published standards on cast iron pipes as to composition and manufacturing characteristics. There are no published standards setting forth how often water mains of any type should be inspected.

2. The difference between pit cast and centrifugal cast iron water mains is that while pit casting is done with a mold and a core, the mold determining the outside of the hollow casting and the core determining the inside dimension of the hollow casting, in centrifugal casting there is no core involved. The mold is revolved, and by centrifugal force the metal is made to conform to the outside of the mold. A metered amount of molten metal is poured into the mold so that the thickness of the pipe, the amount of metal being held against the mold until it chills remains constant throughout the pipe.

3. Pitometer testing measures flow against consumption in a given city block of pipe thereby isolating as leakage unconsumed flow which does not show up in the next city block of the same pipe.

and impede a great deal of vehicular and pedestrian traffic, but the digging itself may tend to alter earth pressure and cause circumferential breaks. Therefore, like most jurisdictions the District of Columbia repairs a main when a break occurs, and replaces a main when a sufficient number of breaks occur to indicate a faulty pipe. In the District of Columbia, the general rule of thumb allows a quota of one break per mile of main per year or 1300 breaks per year. Other jurisdictions maintain a quota as high as three breaks per mile per year before they replace a main. Thus, main failures in the District of Columbia average only one-sixth of the city's own quota and one-eighteenth of quotas established by other cities.[4]

■ ■ Based on the facts set forth above, the court finds as a matter of law that plaintiff has not eliminated all causes of its damages save for defendant's negligence and the doctrine of res ipsa loquitur will not lie. Indeed, the court finds as a matter of law that plaintiff has not demonstrated by a preponderance of the evidence that defendant was negligent in the installation and maintenance of the water main in question. Clearly, the fact that the pipe was 68 years old at the time of the break, the evidence establishing "pit cast, grey iron" cast iron pipe as an acceptable hydrolic conduit material, and the evidence of the over 100-year life span of such pipe, proves that the installation was proper, the materials used were of acceptable quality, and the manufacturing technique was sound. A municipality is not an insurer against damages from broken water mains but must be held only to the same standard of "due care" applicable to individuals and other corporations. See, e. g., Pacific Northern Bell Telephone Co. v. Port of Seattle, 80

Wash.2d 59, 491 P.2d 1037 (1972); Skaggs Drug Centers, Inc. v. City of Idaho, 90 Idaho 1, 407 P.2d 695 (1965); Chavez v. Laramie, 389 P.2d 23 (Wyo. 1964); Mosseller v. Asheville, 267 N.C. 104, 147 S.E.2d 558 (1966). The court finds that the defendant exercised due care in the installation of the main, and the choice of materials for the main.

■ The facts also persuade this court that the issue of alleged negligence in failure to maintain or inspect the water main in question must be resolved in the defendant's favor. Even plaintiff's witnesses agreed that a reasonably prudent water distributor has no obligation to regularly dig up and inspect its buried water mains, and this position is supported by case law. See, e. g., Roberts Realty Corp. v. City of Great Falls, 500 P.2d 956, 962 (Mont.1972); Grace & Co. v. City of Los Angeles, 168 F. Supp. 344, 349 (S.D.Cal.1958); Fanning v. Montclair, 81 N.J.Super. 481, 196 A. 2d 18 (1963); Republic Light & Furniture Co. v. Cincinnatti, 97 Ohio App. 532, 127 N.E.2d 767 (1955). Plaintiff alleges that defendant had a duty to inspect and repair or replace the main in question because previous leaks in it and in other mains in the system put the city on notice, either real or constructive, that a break was likely to occur. The court finds that the occurrence of one circumferential break in the 1200 block of F. Street, N.W. three years before the break in question did not impose a duty to replace or repair the main. Testimony demonstrated that the number of water system failures in the District of Columbia compare favorably with other jurisdictions. Moreover, given the expense and high inconvenience of digging up the main, and given the inspection-per-number-of-breaks rate of other jurisdictions, the District of Col-

---

4. The policy of only replacing a main when a sufficient number of breaks occur is mentioned in case law. See, e. g., Roberts Realty Corp. v. City of Great Falls, 500 P.2d 956, 959 (Mont.1972); Grace & Co. v. City of Los Angeles, 168 F.Supp. 344, 349 (S.D.Cal.1958), aff'd 278 F.2d

771, 773 (9th Cir. 1960). In *Roberts*, the city's replacement formula called for installation of new pipe when "the annual cost of repairing the breaks becomes greater than the annual cost of replacing the main." 500 P.2d at 959.

umbia's policy of allowing a quota of one break per mile per year appears reasonable and not a breach of due care. Although it does not conclusively establish the legal standard, observation of a custom or practice is evidence of due care. Grace & Co. v. City of Los Angeles, 278 F.2d 771, 774 (9th Cir. 1960). See Texas Pacific R. Co. v. Behmer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905 (1903); Hellweg v. Chesapeake & Potomac Telephone Co., 71 U.S.App.D.C. 346, 110 F.2d 546 (1940); Dempsey v. Addison Crane Co., 247 F.Supp. 584 (D.D.C. 1965); Williams v. City of Long Beach, 42 Cal.2d 716, 268 P.2d 1061 (1954); Prosser on Torts, § 33, at 166 (4th ed. 1971).

Therefore, on plaintiff's first count alleging negligence in the installation and maintenance of the water main in question, judgment is entered for defendant.[5]

II. *Negligence in Failing to Take Timely and Reasonable Action to Stem the Continuous Flow of Water From the Broken Main*

This count of negligence is more difficult to resolve because timeliness is an important issue and the trial having occurred six years after the incident, witnesses' memories were understandably imprecise concerning the exact chronology of the events surrounding the break. For example, one witness, a member of the first repair crew on the scene, at various intervals during his testimony changed his recollection of the time when he first noticed water in plaintiff's basement. Still, the court after carefully reviewing the trial transcript and the exhibits of both sides, and giving each witnesses' testimony and each exhibit the weight it believes such evidence deserves, finds the facts relevant to this count of plaintiff's case to be as follows.

At approximately 6:05 a. m. on December 5, 1966, the three-man emergency crew on duty at the headquarters of the city's Water Operations Division received a report that water was coming up through the sidewalk in the 1200 block of F Street, Northwest. The crew, under the supervision of Robert A. Howard was dispatched to this location and arrived at approximately 6:15 to 6:20 a. m. Plaintiff's shoe store was located on the southern side of the 1200 block of F Street, a commercial area, and was serviced by the main in question, a six-inch pipe running west to east on the southern border of the block. A two-inch service line ran from the main to each of the commercial establishments on the southern side of F Street including the plaintiff's building. At the curb, located inside a "buffalo box", an accessible valve housing, was a "curb cock", a valve which could shut off the water from the curb to the building. By turn-

---

5. The court's decision would be the same even if the doctrine of res ipsa loquitur was applicable. "Res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the [fact finder], not that they forestall the verdict. . . . If the defendant's proof operate[s] to rebut the presumption upon which the plaintiff relied, or if it left the essential fact of negligence in doubt and uncertainty, the party who made that allegation should suffer, and not her adversary." Sweeney v. Erving, 228 U.S. 233, 240–241, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913). "Res ipsa loquitur simply means that there arises from the circumstances of the accident an inference of negligence, which is not a presumption but a mere mechanical device that requires the trier of fact— whether judge or jury—to consider the evidence to see whether its preponderance shows the defendant's negligence. The inference, even standing alone, may be rejected by the trier of fact." Martin v. United States, 96 U.S.App.D.C. 294, 297, 225 F.2d 945, 948 (1955). Thus, the court would find that the plaintiff had not met its burden to establish negligence by a preponderance of the evidence even if the res ipsa loquitur doctrine were available to plaintiff.

ing off the "corporation cock", a valve located at the intersection of the service line and the main, the whole service line could be shut down. To completely cut off the main, a series of four valves found at various locations in the area of the 1200 block of F Street had to be shut down, each requiring about 27 ½ turns.

When the Howard crew arrived on the scene, they observed water flowing from the buffalo box breaking over the curb and into the gutter. Because the overwhelming number of water system failures occur in the service line, because water was flowing from the buffalo box on the service line, and because there was comparatively little surface water, the crew initially concluded that the break was in the service line running to 1224 F Street, a dress shop next door to plaintiff's shoe store, rather than in the main. Therefore, the crew began by taking soundings with an "aquaphone" on the curb cock in the buffalo box, but were delayed by difficulties caused by freezing weather. Having obtained access to the curb cock, the crew shut off the curb cock valve, eliminating the water flow between the curb and the building. Soundings at the curb cock indicated that water was still escaping, leading the crew to believe the break was in the service line between the main and the curb. Excavation was begun over the intersection of the service line and the main in order to conduct further soundings and to gain access to the corporation cock. Turning off the corporation cock would prevent the water from flowing from the main into the service line. At approximately 8:00 a. m. a new crew supervised by Mr. Floyd Williams arrived to relieve the Howard crew, which had been working continuously from the time it arrived at the location. Mr. Williams discussed the job progress with Mr. Howard, set up traffic barricades to seal off the block from morning rush-hour traffic, and took aquaphone soundings which confirmed that the area of the Howard crew concentration was close to the source of the leak. Some

time after Williams arrived but before Howard left, approximately 8:15 a. m., Williams learned for the first time that water had leaked into the basement of plaintiff's shoe store at 1222 F Street. He subsequently learned of water in the basement of the dress shop at 1221 F Street and a restaurant on 13th Street. Some time after 8:30 a. m., he began to throttle the main which cut the water flow by two-thirds. Throttling the main required two men to turn off completely all four valves, then open one valve five turns, a process requiring approximately 15 minutes to complete. When Mr. Williams came on the scene he could not have cut off the main immediately because he needed the sound of flowing water to locate the leak. Moreover, it was standard procedure to check with all establishments serviced by the main to warn them of a possible shut down. Mr. Williams once before had precipitately shut down a water main without pre-checking and had caused thousands of dollars in damage. Therefore, he checked with Gude's Florist Shop, the only business establishment to which he could gain access, to make sure it would be safe to cut off the main entirely if it appeared that the leak was in the main rather than the service line. Williams was especially concerned about the florist shop because it employed water-cooled refrigerators to preserve its stock of flowers. The florist shop personnel relayed that they could weather a temporary water shutdown if necessary. Williams' crew had continued excavation in the hole started by the Howard crew, having come to the conclusion that the leak was in the service line somewhere near the intersection of the service line and the main at the corporation cock. After he had left the florist shop Williams observed water gushing from the hole where the men were digging, which signaled the discovery of the leak and the necessity for shutting down the main completely. The partially open valve was turned off by two men at approximately 9:15 a. m. to 9:30 a. m. A four-inch by nine-inch irregular hole

was found on the six-inch main near the corporation cock connecting the service line to 1224 F Street. The pipe was replaced in the afternoon.

Plaintiff alleges that the city was negligent in failing to cut off the main sooner. Thus, the court must decide whether the crews from the defendant's Water Operations Division violated a standard of due care in turning off the water main when they did, or whether the damage to plaintiff's property resulted from an "unavoidable accident", one which could not have been obviated by the exercise of due care by any of the persons whose responsibility for the occurrence is asserted or denied. Sadorus v. Wood, 230 A.2d 478 (D.C.C.A.1967). "Unavoidable accident does not . . . apply only where the injury is brought about by the intervention of outside forces—whether of God, nature or third persons. 'An accident which is caused by an absence of *exceptional* foresight, skill or care which the law does not expect of the ordinarily prudent man is also characterized as inevitable or unavoidable. No redress is afforded for an injury caused by such an accident and the loss must be borne by the one upon whom it falls.'" Beit v. United States, 260 F.2d 386, 388–389 (5th Cir. 1958), *quoting from* Parker v. Womack, 37 Cal.2d 116, 120, 230 P.2d 823, 825 (1951). See Hodgson v. Dexter, 1 D.C. 109, Fed.Cas.No.6,565 (1802), affirmed 5 U.S. (1 Cranch) 345, 2 L.Ed. 130 (1803); Watts v. Smith, 226 A.2d 160 (D.C.C.A.1967); Knox v. Akowskey, 116 A.2d 406 (D.C.C.A.1955).

The general tenor of all of the testimony demonstrates that on-the-scene discovery of leaks from underground water systems is an inexact science. Men dispatched to locate a leak have only an aquaphone, the amount of surface water, the process of elimination, and, most important, their past on-the-job experience to aid them in their search.

An aquaphone is a purely mechanical device that transmits sound vibrations from a flexible steel pointed rod via air pressure to a diaphragm allowing the listener to determine changes in volume and pitch. A higher volume generally indicates either that the listener is near the leak, or that he is not near the leak but the leak is allowing water to escape in a significant flow. The pitch indicates the amount of resistance met by the water flow. However, unknown variables such as the subterranean characteristics in the area of the sounding rod and the amount of pool water surrounding the leak greatly diminish the precision of the instrument. Expert testimony disclosed that the aquaphone is considered 60% accurate.

Surface water can also be misleading. Usually a break in a main will cause a great deal of surface water while a break in a service line will not result in a large quantity of surface water. However, often water from a leaking main fails to surface at all and instead travels through other underground utilities such as gas, telephone and Western Union lines. Surface water has been reported as much as six blocks from an actual water main break. Moreover, the District of Columbia has a brick combined sewer system, and often leaking water enters the underground sewers.

When the Howard crew members arrived on the scene they observed little surface water. Water was coming out of the buffalo box on the service line. The overwhelming number of leaks occur in the service line. Through a logical process of elimination the crew determined that the leak was not on the service line running from the curb to the building. Therefore, they took soundings along the service line from the curb to the area of the service line's intersection with the main. They heard a loud noise near this intersection which caused them to reasonably conclude that the location of the leak was on the service line at that point and they began digging. When the Williams' crew arrived, their soundings confirmed this location. Moreover, in addition to observing comparatively little surface water, Williams also noticed that no water was

emerging between the dirt and concrete in the hole started by the Howard crew, which reinforced his conclusion that the break was in the service line rather than in the main line. It was reasonable then to conclude that the loud sounding reflected a large escape of water, *i. e.*, a possible broken main, but it was equally reasonable, given the nature of the sounding equipment, to assume at the time of the occurrence that the high volume indicated close proximity to a lesser leak—a service line leak. Buttressing the reasonableness of the workmens' conclusions is the fact that the actual break in the main was located in close proximity to the hole being dug.

Furthermore, it appears not only reasonable but a recognized practice to alert recipients of water from a certain water main of an upcoming interruption in water supply. Otherwise, damage caused by the absence of water may equal or exceed damage caused by excess water. Having discovered that the break was in the main, the crew members acted with reasonable speed in shutting down the main given the time consuming mechanics of actually turning off the main.

In sum, in light of the technology available to the crew members, the recognized indicia of a break in the service line, the recognized practice of alerting others of a possible interruption in water service, and the procedures required to actually cut off the main, the court finds that the time involved in the discovery of the nature of the leak and the shutdown of the main in question was not unreasonable, especially in light of the inability at this juncture to pinpoint exact times for the chronology of events leading up to the cut off. The court further finds that defendants exercised due care, and that unfortunate though it may be, plaintiff's damages were sustained as a result of an unavoidable accident. See Beit v. United States, *supra.* The plaintiff having failed to prove by a preponderance of the evidence defendant's negligence in failing to take timely and reasonable ac-

tion to stem the continuous flow of water from the broken main, judgment is entered for defendant on this second count of negligence.

Accordingly, judgment be and hereby is entered on behalf of the defendant on both counts of alleged negligence.

So ordered.