*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2013 UT 59**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ALAN JENKINS, ASH JENKINS, and PATRICIA JENKINS,
*Respondents,*

*v.*

JORDAN VALLEY WATER CONSERVANCY DISTRICT,
*Petitioner.*

No. 20120705
Filed October 1, 2013

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Judith S.H. Atherton
No. 070908316

Attorneys:

Carl E. Kingston, Salt Lake City, for respondents

Karra J. Porter, David C. Richards, Sarah E. Spencer,
Salt Lake City, for petitioner

Mark H. Anderson, Rachel S. Anderson, Salt Lake City,
amicus curiae for Utah Association of Special Districts

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the court:

¶1    The plaintiffs in this case sued Jordan Valley Water Conservancy District (the District) after one of its water pipelines broke and damaged their home. Following discovery, the District moved for summary judgment, asserting, among other things, that the plaintiff homeowners could not prevail on their negligence claim because they had failed to designate an expert to testify regarding the applicable standard of care. The district court granted that motion, and the homeowners appealed. The court of

appeals reversed, concluding that expert testimony was unnecessary because the District itself had previously determined that the pipeline should be replaced—a determination that in the court's view sustained a standard of care calling for replacement.

¶2 We granted certiorari and now reverse the decision of the court of appeals. The District's internal decision recommending replacement did not establish that such a move was required by a standard of care. And because the question whether a pipeline needs to be replaced is outside the knowledge and experience of average lay persons, the homeowners had an obligation to designate an expert to establish a basis for such a duty. Their failure to do so was fatal to their negligence claim, and the district court was right to dismiss it on summary judgment. We reverse the court of appeals on that basis, while vacating—without reaching—the other grounds for its decision.

I

¶3 Alan Jenkins, Ash Jenkins, and Patricia Jenkins own a home located on the 400 East block of 3300 South in Salt Lake County. A water pipeline is buried under 3300 South in this area. The pipeline is owned and operated by the Jordan Valley Water Conservancy District, a political subdivision of Utah that operates about 275 miles of pipelines throughout Salt Lake County.

¶4 On November 19, 2005, a pipe segment near the Jenkins home broke, flooding the basement of their home. This was the first time the pipeline, a six-inch cast-iron water main installed in 1957, had broken along the 400 East block—although a number of breaks had occurred on different blocks. District employees unearthed the pipe to survey the break. They found a "hole" break on the top of the pipe at a depth of five feet and repaired it with a clamp—at a cost of $3,618.05. At that time, the District voluntarily provided the Jenkinses with assistance in remedying the damage caused to their home—replacing their water heater and repairing their furnace and air conditioning system.

¶5 Employees of the District determined that the pipe was in "fair" condition at the time of the 2005 repair. But a few years earlier, in an annual assessment of all of the District's pipelines, the District's engineering department had identified the 400 East pipeline segment as a candidate for replacement (along with 42,500 other feet of pipeline). This replacement did not occur,

however, as other pipelines ultimately took priority. And the engineering department did not re-recommend the segment as a candidate for replacement in 2004–05.

¶6    Soon after the 2005 flooding incident, the District learned that South Salt Lake City was planning to replace sidewalks, curbs, and gutters on 3300 South in October 2006. The District determined that it would replace the 400 East pipeline at that time in order to minimize construction-related disruption.

¶7    On October 2, 2006, as District employees were in the process of laying new pipe, another break occurred in the old line near the Jenkins property. This break was in a different location than the first break—on the side of the pipe, at a burial depth of four feet—and was not caused by the replacement process. Unfortunately, the resulting leak caused further damage to the Jenkins home.

¶8    This time the District declined to compensate the Jenkinses. They then filed this lawsuit, asserting that the District had been negligent in failing to replace the pipeline earlier.[1] Following discovery, the District moved for summary judgment on four grounds: (1) that the claims were barred by the public duty doctrine, (2) that even if the claims were not barred by the doctrine, the Jenkinses could not prevail since they had failed to designate an expert (and thus could not establish either the applicable standard of care or that it had been breached), (3) that the District was immune from suit under the Utah Governmental Immunity Act, and (4) that the trial court lacked jurisdiction over some of the claims because they had not been identified in the notice of claim. The district court entered summary judgment for the District based on the public duty doctrine. The court did not reach the District's other arguments.

¶9    On appeal, the court of appeals reversed the district court's decision. *See Jenkins v. Jordan Valley Water Conservancy Dist.*, 2012

---

[1] Initially, the Jenkinses also claimed that the District had negligently repaired the pipeline following the 2005 break. But they abandoned this claim after discovering that the 2006 break was in a different location and did not pursue the negligent repair theory on appeal. *See Jenkins v. Jordan Valley Water Conservancy Dist.*, 2012 UT App 204, ¶ 23 n.6, 283 P.3d 1009.

UT App 204, ¶ 1, 283 P.3d 1009. It held that the district court had erred in granting summary judgment because (1) the public duty doctrine did not bar the Jenkinses' claim due to the special relationship exception, *id.* ¶ 114, (2) there was no need for expert testimony under the unique facts of this case, *id.* ¶ 115, and (3) although the District was immune from suit under the Utah Governmental Immunity Act, *id.* ¶ 116, applying the Act to preclude the homeowners' suit violated the Open Courts Clause of the Utah Constitution, *id.* ¶ 117. We granted the District's subsequent petition for certiorari.

II

¶10 The District asserts three errors in the decision of the court of appeals: (1) in the conclusion that the public duty doctrine did not bar the Jenkinses' claim, (2) in the holding that the Jenkinses were not required to present expert testimony to establish a duty to replace the pipeline, and (3) in the determination that the Governmental Immunity Act was unconstitutional as applied here. We reverse based upon the second asserted error, applying a correctness standard of review. *See State v. Ramirez*, 2012 UT 59, ¶ 7, 289 P.3d 444.

¶11 The court of appeals' decision rested on its erroneous determination that the District's internal decision to replace the pipeline established the applicable standard of care. Because it did not, and since assessing the question whether a pipeline requires replacement is not within the knowledge and experience of average lay persons, the Jenkinses were obligated to present expert testimony to establish the District's negligence and survive summary judgment.

A

¶12 The court of appeals acknowledged that the question whether a cast-iron pipeline needed replacing was a matter generally outside the knowledge and experience of lay persons. *See Jenkins v. Jordan Valley Water Conservancy Dist.*, 2012 UT App 204, ¶¶ 34–35, 37, 283 P.3d 1009. Its opinion even cited caselaw to that effect. *See id.* ¶¶ 34–37 (citing *District of Columbia v. Arnold & Porter*, 756 A.2d 427 (D.C. 2000)). But under the particular circumstances of this case, the court concluded that expert testimony was unnecessary. It rooted that decision in the fact that the District had "negligently waited over three years before actually replacing"

the pipeline, despite having already "ma[de] the determination that the [pipeline] needed to be replaced." *Id.* ¶ 37.

¶13  The court of appeals' determination that expert testimony was unnecessary rested on a simple premise: that an internal recommendation of replacement sustained a tort law duty to do so. *See id.* ¶ 40 (characterizing the pipeline as "obsolete"). We find that premise problematic.

¶14 An internal determination that a pipeline should be replaced does not establish a tort law duty to do so. Internal decisions may be made for any number of reasons—convenience, caution, maximization of budget, mistake—having little to do with the standard of care.[2] Thus, the resolution of this issue cannot be "narrowly focused," as the court of appeals put it, "on the decision to delay three years before replacing the [pipeline]." *Id.* ¶ 37.

B

¶15  Instead, the critical issue is whether the applicable standard of care required the District to replace the pipeline near the Jenkins home. *See Slisze v. Stanley-Bostitch*, 1999 UT 20, ¶ 10, 979 P. 2d 317 ("In order to prevail on a negligence claim, there must be evidence of a duty breached."). And we cannot see how the Jenkinses could show that it did without expert testimony.

---

[2] As the District more amply explained in its briefs on appeal, its replacement considerations included the following: "(1) [the] [c]ost of replacement; (2) [t]he prior fiscal year's allocation for this category of improvement projects; (3) [t]he pipeline's location; (4) [w]hat is physically situated above and in the vicinity of the line; (5) [t]he depth of the line; (6) [t]he soil conditions in which the line sits, including whether it is particularly corrosive; (7) [w]hether there has been recent construction above or in the vicinity of the pipeline, to avoid unnecessary demolishment of recent improvements to property, roads, sidewalks, and landscaping; (8) [w]hether the District can obtain the necessary permitting to carry out the replacement; [and] (9) [t]he history of the types of breaks to pipelines, based upon the information set forth in the Break/Leak Reports, including whether the break was a shear break, cathode break, hole break, split break, or a manufacturing defect break."

1

¶16 Lay persons are not well equipped to decide whether a cast-iron pipe has gotten so old that it requires replacement. Such pipes have no pre-determined lifespan.[3] According to expert testimony offered in other cases, the useful life of a cast-iron pipe may vary widely, depending on a range of factors such as soil conditions, burial depth, and the extent of any earth movement in the area. *See, e.g., I.M. of Atl. City v. District of Columbia*, 356 F. Supp. 487, 489–90 (D.D.C. 1973) (providing substantial discussion, based on expert testimony, about the indeterminate lifespan of cast–iron pipes and the many factors that bear on this matter); *Grace & Co. v. City of Los Angeles*, 168 F. Supp. 344, 346, 348–49 (S.D. Cal. 1958) (explaining that one segment of cast-iron pipe might require replacement, whereas another one installed at the same time might not).

¶17 Such nuanced assessments are beyond the ken of the average juror. There is no objective measuring tape for such decisions; they require expert, nuanced analysis of matters beyond the normal experience of the average layperson. *See Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980) (explaining that expert testimony is generally required to establish the standard of care in medical malpractice cases "because the nature of the profession removes the particularities of its practice from the knowledge and understanding of the average citizen").

2

¶18 Physical indicators of pipeline degradation are equally inadequate to the task of indicating that a pipeline had reached the state of requiring replacement. Breakage history, for example, would indicate only that a particular pipe had an imperfection. But that would shed little light on whether the applicable standard of care required replacement.

---

[3] *See I.M. of Atl. City v. District of Columbia*, 356 F. Supp. 487, 489–90 (D.D.C. 1973) (explaining that most of the pipes in the District of Columbia were made of cast-iron, and that the average age of these pipes was seventy-five years old, although some pipelines were more than one-hundred years old, and that "[t]he oldest pit cast grey iron system still in use in the world was built in 1664 by King Louis of France and is located in Versailles").

¶19 A history of breakage is not a mandate for replacement.[4] Often the prudent response will be repair, not outright replacement.[5] And the repair/replace decision is inherently complex and case-specific, requiring the detail necessary to perform the cost-benefit calculus and the sophistication necessary to interpret it.[6]

¶20 In the absence of expert assistance, jurors would not likely possess the information or understanding necessary to make such assessments. *See Arnold & Porter*, 756 A.2d 427, 433–34 (D.C. 2000) (concluding that "the operation and maintenance of a municipal water main system and the handling of leaks in that system are not subjects within the common knowledge of jurors").[7] They

---

[4] *See I.M. of Atl. City*, 356 F. Supp. at 491 (explaining, based on expert testimony, that cast-iron pipes break with some frequency and that this does not necessarily indicate they need to be replaced).

[5] *See Friedman v. U.S. Home Corp.*, 452 So. 2d 1111, 1112 (Fla. Dist. Ct. App. 1984) (illustrating disagreement among experts over whether a concrete slab needed to be replaced instead of being repaired).

[6] *See Wortham Bros., Inc. v. Haffner*, 347 S.W.3d 356, 361 (Tex. App. 2011) (Because "[t]he necessity of [a] subsequent, total roof replacement[]" was a "matter[] of a specialized and technical nature. . . . expert testimony was required to establish the necessity and reasonableness of the subsequent roof replacements . . . The [respondents] presented a great deal of evidence to support the trial court's findings that the roof repairs performed by or on behalf of [the defendant] were deficient. Thus, the record contains evidence of the necessity of some subsequent repairs. However, there is no expert testimony that the roofing work by [the defendant] had to be completely removed and replaced.").

[7] In so concluding, we need not foreclose the possibility of a future case in which the breakage rate of a pipeline is so extensive and frequent, and so resistant to repair, that a *res-ipsa-loquitur-* style inference could be made—one suggesting that the standard of care would necessarily call for replacement, even without expert testimony. But this is not such a case. The 2005 break was the first one on the 400 East block. *See supra* ¶ 4; *see also I.M. of Atl. City*, 356 F. Supp. at 491 (explaining that a relatively significant

would not likely know, for example, the background rate of "normal" breakages, and thus would have no non-speculative benchmark against which to assess any breakage history.[8] Nor would they have any meaningful way to assess whether or to what extent past breakages portended future ones, or called for replacement rather than repair.[9]

---

number of breaks are permitted each year). And given that the depth of the pipeline, ground movement, and soil conditions all affect the useful life of a pipeline, *supra* ¶ 16, we cannot infer from breakages on other blocks (where these conditions might well be different) that the standard of care demanded that the 400 East pipeline needed replacement. *See Grace & Co. v. City of Los Angeles*, 168 F. Supp. 344, 346, 348–49 (S.D. Cal. 1958) (explaining, based on expert testimony, that corrosion of a pipe may "occur on the top of the pipe and not on the bottom, or on one side and not the other" or "in one spot and then . . . not . . . for many feet along the line" and that despite the need to repair an opening in the pipe "approximately the size of a human hand," the city "discovered that within a short distance on either side of the opening the pipe was in sound condition, so that it could be continued in use").

[8] *See I.M. of Atl. City*, 356 F. Supp. at 491–92 (concluding that "the occurrence of one circumferential break" in the same block "three years before the break in question did not impose a duty to replace or repair the main" citing expert testimony that "demonstrated that the number of water system failures in the District of Columbia compare favorably with other jurisdictions" and "the District of Columbia's policy of allowing a quota of one break per mile per year appears reasonable and not a breach of due care"); *Grace & Co.*, 168 F. Supp. at 348–49 (explaining that Los Angeles had adopted a policy of repairing leaks when they developed and replacing the pipes when these leaks became too numerous).

[9] *See Nat'l Fuel Gas Distrib. Corp. v. Erie Cnty. Water Auth.*, 952 N.Y.S.2d 365, 366–67 (N.Y. App. Div. 2012) (sustaining a district court's determination that a water authority had been negligent where, in addition to advancing evidence that there had been multiple prior breaks of the water main in the same vicinity, "plaintiff's expert [had] testified that defendant should have replaced at least a portion of the water main after the previous breaks occurred").

¶21 Thus, left to their own devices, jurors would be forced to speculate about how a reasonable water conservancy district would act, and about whether the District failed to conform to that standard by failing to replace the 3300 South pipeline earlier.[10] Such speculation has no place in our courtrooms—on matters of duty, breach, or otherwise. *See Slisze*, 1999 UT 20, ¶ 10 ("In order to prevail on a negligence claim, there must be evidence of a duty breached.").

¶22 The court of appeals accordingly erred in concluding that the Jenkinses needed no expert testimony to establish a standard of care requiring replacement of the District's pipeline. We therefore reverse. In so doing, we also vacate the remainder of the court of appeals' decision. We do so "[w]ithout expressing approval or disapproval of the legal conclusions" in that opinion, while vacating it so the decision will not "be left standing to affect subsequent proceedings." *Merhish v. H.A. Folsom & Assocs.*, 646 P.2d 731, 733 (Utah 1982).[11]

———————

[10] *See Edwards v. Didericksen*, 597 P.2d 1328, 1330 (Utah 1979) (explaining that expert testimony "enhance[s]" the accuracy of fact finding since "unnecessary and improper jury speculation is avoided" by it).

[11] *See also State ex rel. B.R.*, 2007 UT 82, ¶¶ 6, 16, 171 P.3d 435 (reversing the court of appeals and vacating its opinion).