Gary **MESSINA**, Appellant,

v.

**DISTRICT OF COLUMBIA**, Appellee.

No. 94–CV–17.

District of Columbia Court of Appeals.

Argued April 6, 1995.

Decided Aug. 17, 1995.

Thomas Fortune Fay, Washington, DC, for appellant.

Martin B. White, Assistant Corporation Counsel, with whom Garland Pinkston, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, Washington, DC, were on brief, for appellee.

Before TERRY, SCHWELB, and KING, Associate Judges.

KING, Associate Judge:

In this negligence action against the District of Columbia ("District"), appellant Gary Messina ("Messina"), father and next friend of minor Karyne Messina ("Karyne"), seeks reversal of the entry of judgment as a matter of law in favor of the District, contending that the testimony of his expert witness was sufficient to establish the requisite standard of care. Messina also contends that it was reversible error for Judge Burgess to deny his motion to amend the pre-trial order to permit the testimony of a new witness.[1]

For the reasons set forth below, we hold that, because Messina failed to present expert testimony sufficient to establish the standard of care owed to Karyne by the District, he did not present a prima facie case of negligence; accordingly, we affirm the trial court's grant of the District's motion for judgment as a matter of law.

## I.

In September 1990, while in the fourth grade at the Lafayette Elementary School in the District, Karyne Messina broke her arm

---

1. Messina sought to introduce the testimony of Dale Miller, the president of the company that manufactured the playground equipment involved in this case. It is unclear exactly what the content of Miller's testimony would have been, but it appears from the record that Messina was aware of the witness' identity long before discovery had closed. For that reason, we perceive no abuse of discretion on the part of the motions judge in denying the motion to amend. *See Daniels v. Beeks*, 532 A.2d 125, 128 (D.C. 1987) (we review trial court's denial to amend pre-trial order for abuse of discretion).

when she fell to the ground while playing on a set of monkey bars at the school's playground. The monkey bars used by the child were known as a horizontal ladder; that is, a ladder of evenly-spaced bars bolted parallel to the ground to four wood posts approximately eight feet high. Karyne was swinging from one bar to the next with her hands when one bar rotated in its sockets, causing her to lose her balance and fall to the ground.[2] Karyne struck the ground, which she described as "hard packed mud, dirt" with some wood "chips" on it, with her left hand and arm, causing a fracture which required her arm to be kept in a cast for several months. According to her testimony, Karyne continues to experience pain in the arm when she plays sports and during changes in the weather.

On December 27, 1991, Messina brought this claim against the District, maintaining that the District was negligent in failing to make the ground safe beneath the monkey bars where Karyne fell. In a jury trial beginning on January 4, 1994, Messina presented Mr. Paul Hogan ("Hogan"), a playground designer and builder, as an expert on standards of care in the construction of playgrounds. Hogan testified that "within the public playground industry" there was a standard of care that required the District to have a certain quantity and quality of resilient cushioning material, such as mulch, wood chips, or chopped tires, on the ground under the monkey bars where Karyne fell. The witness testified that these standards had first been developed in 1933–34 in a publication by the American Recreation Association which advised the public of the need for playground safety. They were later developed into a handbook, which contained two articles written by Hogan, entitled Guidelines for Public Playground Safety, which was

published by the Consumer Products Safety Commission ("CPSC") in 1981 ("1981 Handbook"), and again in 1991, a year after Karyne was injured, when the guidelines were "fine tuned." Hogan testified that the 1981 standards "had been accepted ... worldwide as the guidelines for proper playground safety development ... even though they weren't mandated by law and they weren't enacted by Congress."

In particular, Hogan testified that, to avoid fracturing a human skull, cushioning material below the monkey bars should provide a surface impact resistance of no more than 200 G's.[3] Hogan stated that the 200 G guideline was developed in tests done on the human skull because "that is the only uniform part of a human body," and that based on these tests, the 1981 Handbook "recommends" a playground surface resistance of no more than 200 Gs.[4] Mr. Hogan further testified that, *in his opinion*, in order to meet that standard, using wood chips or similar material as cushioning, it would be necessary to provide a layer approximately ten to twelve inches deep for playground equipment eight feet high like the equipment Karyne was using when she was injured.

At the close of Mr. Hogan's testimony, the trial court granted the District's motion for judgment as a matter of law, ruling that Hogan's testimony failed to establish a standard of care which the District was required to follow. This appeal followed.

## II.

"The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Toy v. District of*

---

**2.** Messina does not contend that the rotation of the bar, or the fall itself, were the result of negligence by the District.

**3.** A "G" is "a unit of force equal to the gravity exerted on a body at rest." WEBSTER'S II, NEW RIVERSIDE UNIVERSITY DICTIONARY. According to Hogan, a "G is the weight of your body."

**4.** Hogan testified that the tests developing the 200 G guideline "evolved from the safety belt

testing conducted by General Motors ... in the late '50s and early '60s, where they had these dummies in cars and they were strapped in and they would smash a car through a concrete wall and the dummies would go forward and hit the dashboard or hit the glass and they had instrumentation in those dummies that indicated that an impact of more than 200 Gs would result in a skull fracture."

*Columbia,* 549 A.2d 1, 6 (D.C.1988) *(quoting Meek v. Shepard,* 484 A.2d 579, 581 (D.C. 1984)). While expert testimony regarding the appropriate standard of care is not necessary for acts "within the realm of common knowledge and everyday experience," *District of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982), "[a] plaintiff must put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987) (citations omitted). Because the question whether the District should conform to a particular cushioning standard for the ground under the monkey bars to prevent injuries is not a subject within the understanding of the average juror, "expert testimony was essential." *District of Columbia v. Moreno,* 647 A.2d 396, 399 (D.C.1994) "Where expert testimony is necessary, however, it is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances." *Toy,* 549 A.2d at 7 (citations omitted). Rather, the expert must clearly articulate and reference "a standard of care by which the defendant's actions can be measured." *District of Columbia v. Carmichael,* 577 A.2d 312, 314 (D.C.1990) (citations omitted).

Through Mr. Hogan, Messina presented evidence that, as of the time of the accident, various authorities had recommended the 200 G cushioning guideline to prevent skull fractures as a desirable safety practice, but that the guideline had not been promulgated as a law or regulation. Hogan expressed his opinion that this guideline represented the worldwide standard for public playground safety. Hogan also testified that in order to meet that guideline, and for a fall of eight feet, ten to twelve inches of certain cushioning materials was necessary. The issue before us is whether Hogan's opinion was legally sufficient to permit this claim of negligence to go to a jury. We hold, on the circumstances presented here, that it was not.

The essence of Hogan's testimony was that the applicable standard of care is determined in a two-step process. First, the 200 G guideline determines the limit in order to avoid skull fractures. Second, to meet the 200 G guideline, Hogan opined that cushioning material must be provided to a specified depth depending upon the cushioning material and the height of the fall. Both steps must be satisfied in order to establish a standard of care.

With respect to the first step, Hogan testified that the 200 G guideline was promulgated in the 1981 Handbook.[5] The 1981 Handbook specified, however, that any guidelines contained therein were not to be considered as CPSC standards, and were not mandatory. The 1981 Handbook, moreover, did not specify the depth of cushioning materials, which varies with the height of the equipment and the type of cushioning, necessary to meet the 200 G guideline. Nor did the 1981 Handbook provide a comparable guideline to avoid a broken arm like the one sustained in this case. In short, the 1981 Handbook did nothing more than recommend a 200 G guideline for skull fractures. Hogan, however, testified that the 200 G guideline, in his opinion, was a national standard for playground safety, and we will assume, without deciding, that it was sufficiently established as a national standard in this case. We now turn to the second step of the process.

Hogan testified that, through a series of tests he conducted some years after the 1981 Handbook was published, he determined that ten to twelve inches of mulch or similar material would meet the 200 G guideline for a fall of eight feet. A chart reflecting the results of his research was prepared by him and admitted into evidence.[6] Hogan also testified that the chart had been published many times, but he did not say when the

---

5. The 1981 Handbook, or at least copies of portions of the Handbook, was admitted into evidence, but it is not part of the record in this appeal. Therefore, the only record references to the contents of the 1981 Handbook are found in Hogan's testimony.

6. That chart is not part of the record on appeal; however, a chart which purports to be a copy of the one admitted at trial, is included in Messina's brief.

tests were performed or when or where the chart had been published. Hogan acknowledged that the results of his research have not been accepted by any government agency.[7]

We conclude that Hogan's testimony, with respect to the depth of cushioning material, even when viewed in the light most favorable to Messina, *see Toy*, 549 A.2d at 6, failed to establish any national standard of care; therefore Messina did not present a prima facie case of negligence. While Hogan relied on the chart he had developed, there was no evidence that it constituted any kind of national standard, that it had been promulgated, or was generally known, before Karyne was injured, or that the District should have been aware of its existence. Moreover, there was no evidence of the extent to which municipalities or other school systems actually complied, or even attempted to comply, with the guidelines reflected in the chart. Without some showing of where or how these guidelines were implemented or applied, Hogan's testimony fails to identify "any concrete standard upon which a finding of negligence could be based." *Carmichael*, 577 A.2d at 315. Consequently, Hogan's testimony did not establish any basis for concluding that ten to twelve inches of common cushioning material was a national standard.

The only possible basis given by Hogan for his opinion that ten to twelve inches of mulch provides a national standard of care is his testimony that manufacturers of playground equipment, in their catalogues, recommend cushioning material of specific depths. That testimony, however, was objected to by the District on the grounds that Hogan did not specify which manufacturers provided the information or whether the information was being provided to customers by manufacturers before the injury occurred.[8] Although counsel for Messina agreed to elicit clarification on those points, he never did so. There-

fore, the record is silent whether, at the time of the injury, warnings concerning the depth of cushioning were being provided by manufacturers of the playground equipment.

Hogan's testimony is not unlike the expert's testimony in *Toy, supra*, 549 A.2d 1. In that case, the widow and mother of the deceased ("Toy") sued the District for negligence, contending that District employees failed to correctly administer cardiopulmonary resuscitation ("CPR") after Toy was found hanging in his cell following his arrest. To show that the District breached its standard of care towards Toy, appellants presented an expert who testified that "the District's police officers negligently treated Toy once he was discovered hanging because the Traffic Division lacked oxygen and other emergency equipment" to provide proper CPR. The expert's testimony was based on his review of a booklet published by the American Correctional Association Accreditation Program and a suicide report by the National Center of Institutions and Alternatives. *Id.* at 7. However, the expert "gave no indication of how many police departments throughout the country have this type of emergency equipment available," and the court specifically noted that "[o]ne instance of a police department with [such] emergency equipment is plainly insufficient to provide a factual basis for an expert opinion that the national standard of care requires police departments to maintain resuscitation equipment." *Id.* at 8. Because Toy's expert did not refer to a specific standard of care to which the District was subject, and did not establish that other police departments provide such CPR equipment, this court held that the Toys failed to establish that the District employees did not comply with "any general requirement" to administer assistance to Toy, and thus affirmed the judgment for the District. In the instant case, Hogan's

---

7. In 1991, after the child suffered her injury, the CPSC promulgated some guidelines concerning the accepted depth of various cushioning materials, and this publication was referred to during the course of Hogan's testimony. Like the 1981 Handbook, the 1991 publication is not part of the record on appeal, although Messina has included a chart in his brief which he claims was part of the 1991 CPSC publication.

8. Although we have held that warnings by the manufacturer are admissible on the question of standard of care, we have never decided whether such warnings, without more, can serve as the sole basis for the expert's opinion, and we do not do so now. *See generally Garvey v. O'Donoghue*, 530 A.2d 1141, 1145–46 n. 7 (D.C.1987).

testimony also failed to establish a standard of care because there was no showing whatever that providing ten to twelve inches of cushioning for an eight-foot fall was a national standard, that the District was aware of it, or that other public playgrounds used it.

Messina relies on *District of Columbia v. Peters, supra,* 527 A.2d 1269; however, we conclude that *Peters* supports the conclusions we reach here. Peters and his wife sued the District for wrongful death, alleging use of excessive force and failure to properly train a police officer. The case arose from the shooting of Peters by a police officer during Peters' arrest, and Peters' suicide two years later. This court held that the testimony of the Peters' expert in the field of criminology was sufficient to establish the appropriate standard of care because the expert testified "that many police departments train their officers to handle mentally disturbed persons and persons under the influence of drugs." *Peters,* 527 A.2d at 1273. In *Peters,* however, in contrast to what occurred in *Toy* and in this case, the expert also gave specific examples of law enforcement agencies which provide such training. *Id.* at 1273. Specifically, the expert in *Peters* testified that "he knew of no metropolitan police department other than the District's which provide no [such] training whatsoever...." *Id.* Consequently, the court found that the expert in *Peters* provided a sufficient factual basis for the jury to determine a standard of care beyond the expert's personal opinion of what was appropriate. *See Toy, supra,* 549 A.2d at 7. Hogan's testimony fell short of the expert testimony in *Peters,* because Hogan provided no basis, other than his own personal opinion, for the conclusion that ten to twelve inches of wood chips or similar materials would provide the necessary cushioning.

In sum, we hold that Hogan's testimony failed to establish the standard of care against which an impartial trier of fact could reasonably assess the District's actions in

this case. "Without sufficient proof of the standard of care," the trial judge did not err in not sending the case to the jury. *See Carmichael,* 577 A.2d at 316; *Moreno,* 647 A.2d at 399; *Toy,* 549 A.2d at 6. Accordingly, we affirm the trial court's judgment in favor of the District.[9]

*Affirmed.*

---

9. In its brief, the District contends that "the absence of evidence on causation is the most glaring inadequacy in the *Messinas'* case." In short, the District argues that even if the District had violated some national standard concerning cushioning material necessary to prevent skull fractures, Messina has failed to show a violation of that standard caused the child's broken arm. However, because the District moved for judgment as a matter of law at the close of Hogan's testimony, Messina did not have an opportunity to present his entire case, including medical testimony and the testimony of Mr. Messina. We, therefore, cannot assume that Messina would not have shown causation had he had the opportunity; therefore, we decline to resolve that issue.