Frankie CLARK, Appellant,

v.

**DISTRICT OF COLUMBIA,**
**et al., Appellees.**

No. 95–CV–142.

District of Columbia Court of Appeals.

Argued May 9, 1997.

Decided Sept. 18, 1997.

Rehearing Denied Feb. 4, 1998.

Morgan Hallmon, Bethesda, MD, for appellant.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Charles F.C. Ruff, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellees.

Before TERRY, STEADMAN and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

This case arises from the suicide of appellant Frankie Clark's fourteen-year-old son K.F. that occurred while K.F. was in the custody of the appellee District of Columbia at the Receiving Home for Children ("Receiving Home"). Following a two-week jury trial, the trial court granted the District's motion for directed verdict on appellant's negligence claim. Because appellant failed to prove a violation of the requisite national standard of care, we affirm.

## I.

K.F. was a mildly retarded young man who had a long history of behavioral problems, institutionalization and unfulfilled suicide threats. On the morning of January 12, 1993, he was in disciplinary lock-down at the Receiving Home for fighting.[1] K.F. was upset about being in lock-down and requested a hearing to contest his lock-down status. At about 9:30 a.m., a hearing was held where K.F. repeatedly cursed the hearing officer.

After the hearing concluded, K.F. told a member of the staff that he was going to kill himself, and tied a sheet around his neck. K.F. also threw a chair into a glass partition which caused the partition to shatter. Following this outburst, K.F. was restrained by Receiving Home personnel and forcibly returned to his room while he continued to threaten to kill himself.

In response to these threats, K.F.'s room was swept and stripped of all items except for the bed spring. At this time K.F. was wearing only a pair of boxer shorts. At about 10:00 a.m., an art therapist visited K.F. in his room, and he again threatened to kill himself saying he would eat glass. The art therapist then placed K.F. on "Greenline" warning suicide monitoring status. The art therapist subsequently discussed the situation with the resident psychiatrist who agreed that Greenline warning status was appropriate.

Under the Suicide Prevention Plan then in effect at the Receiving Home there were three levels of suicide monitoring or "Greenline status": warning, watch and alert. Greenline warning status was the least restrictive level and was appropriate for residents who had a previous Greenline or psychiatric history but were manifesting no current suicidal ideations or gestures. Greenline warning status required that the resident be kept in a room and observed four times an hour at staggered intervals. The next level, Greenline watch status, was appropriate for residents who had made current suicide threats. Under Greenline watch, the resident was to be kept in the line of sight of a staff member at all times. The third and highest level, Greenline alert, was for residents who had recently made a suicide gesture or attempt. Under Greenline alert, a staff member was required to remain in close physical proximity to the resident and keep the resident in line of sight at all times. K.F. was thus placed on the lowest level of suicide monitoring and was supposed to be kept in his room and

---

1. The Receiving Home was a facility for detained youth awaiting trial but also housed children who were adjudicated delinquent. *See In re*

*W.L.*, 603 A.2d 839, 840 (D.C.1991). The Receiving Home was closed sometime after K.F.'s suicide.

subjected to random checks four times an hour.

The Greenline observation form completed for K.F. that day indicates that he was checked at regular fifteen minute intervals from 10:00 a.m. until 12:45 p.m. During this time K.F. was observed kicking the door of his room, eating lunch, tearing up paper plates, and jumping on his bed. At 12:52 p.m. a staff member discovered K.F. hanging by the elastic waistband of his boxer shorts from a bar on the window of his room. K.F. was removed from the bar and taken to the hospital where he died the next day.

Appellant brought this suit under the wrongful death and survival statutes, and argued that the District was negligent because it violated the Suicide Prevention Plan by placing K.F. on Greenline warning instead of Greenline watch status as required by K.F.'s suicide threats and gesture.[2] At the close of the plaintiff's case, and again at the close of all the evidence, the District moved for directed verdict on the grounds that the plaintiff had failed to prove the requisite standard of care. The District argued that because the Suicide Prevention Plan was an unpublished internal guideline it could not serve as the standard of care in a negligence action. It also argued that the testimony of appellant's expert witness was legally insufficient because it was not based on a published national standard of care and consisted merely of his own personal opinion. The trial court rejected these two arguments, but granted the motion for directed verdict on the grounds that the appellant had failed to prove that K.F.'s suicide attempt proximately caused his death, and that appellant's expert, who was the director of the unit regulating juvenile detention facilities in New Jersey, was not professionally qualified to dispute the medical and clinical judgment of the Receiving Home's psychiatrist that K.F. be

placed on Greenline warning status. This appeal followed.

## II.

Appellant's primary contention on appeal is that the trial court erred in granting a directed verdict on the above-mentioned grounds. We need not decide whether the trial court erred in ruling on these bases; the directed verdict was correct in any event because, as the District presses on appeal, appellant's expert failed to provide sufficient testimony that the District violated a national standard of care. *See Sebastian v. District of Columbia*, 636 A.2d 958, 959–60 n. 2 (D.C. 1994) ("we may affirm the judgment of the trial court for reasons other than those upon which it relied").

"The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Messina v. District of Columbia*, 663 A.2d 535, 537 (D.C. 1995); *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988). "While expert testimony regarding the appropriate standard of care is not necessary for acts within the realm of common knowledge and everyday experience, a plaintiff must put on expert testimony to establish what that standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Messina, supra*, 663 A.2d at 538 (citation omitted). We have repeatedly held that the standard of care owed by the District of Columbia to persons in its custody is a matter beyond the ken of the average juror that requires expert testimony. *See District of Columbia v. Moreno*, 647 A.2d 396, 398–99 (D.C.1994); *District of Columbia v. Carmi-*

---

2. Appellant also brought suit for an unrelated assault and battery allegedly perpetrated on K.F. by Maurice White, an employee of the Receiving Home. The jury returned a verdict for White and the District on the assault and battery count, and the trial court denied appellant's motion for a new trial. Appellant now contends that the trial court erred in denying her motion for new trial as against the weight of the evidence. We review a trial court's denial of a motion for new trial for abuse of discretion, and are especially deferential when that denial sustains a jury verdict. *Oxendine v. Merrell Dow Pharm., Inc.*, 506 A.2d 1100, 1110–11 (D.C.1986). Here there was conflicting testimony requiring a credibility determination about whether White assaulted K.F. Under the circumstances we find no abuse of discretion in the trial court's denial of the motion for new trial.

*chael,* 577 A.2d 312, 314 (D.C.1990); *Toy, supra,* 549 A.2d at 7; *Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.1981). *See also Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986) (noting use of expert testimony to prove standard of care in case where a thirteen-year-old patient committed suicide in a private psychiatric hospital). Thus, expert testimony was required here.

■ In the context of actions against the District by persons in its custodial care, we have been demanding in requiring proof of a national standard of care. *See Moreno, supra,* 647 A.2d at 400; *Carmichael, supra,* 577 A.2d at 315; *Toy, supra,* 549 A.2d at 7–8. *See also Messina, supra,* 663 A.2d at 539 ("We conclude that [the expert's] testimony ... failed to establish any national standard of care; therefore [plaintiff] did not present a prima facie case of negligence."). "Where expert testimony is necessary ... it is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances." *Messina, supra,* 663 A.2d at 538. Nor is it enough for the expert simply to declare that the District violated the national standard of care. "Rather, the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured." *Id.* (emphasis added). Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable governmental facilities or to some standard nationally recognized by such units. If the expert fails to do so, a directed verdict for the defendant is properly granted. *See Toy, supra,* 549 A.2d at 7–8 (noting that plaintiff's expert in suicide case "did not provide any basis for his opinion that national standards required the District to have oxygen and other emergency equipment available"); *Carmichael, supra,* 577 A.2d at 315 (indicating that "[c]ritically absent from [the expert's] testimony was any statement, for example, that a certain percentage of comparable facilities did have metal detectors, and that these

metal detectors were customarily in service over certain periods of time"); *Moreno, supra,* 647 A.2d at 400 (noting that plaintiff's expert failed to "make any comparisons to other similar facilities").

■ Here appellant's expert, Joseph DeJames, recited the facts surrounding K.F.'s death and concluded that the employees of the Receiving Home had violated the Suicide Prevention Plan by placing K.F. on Greenline warning rather than Greenline watch. DeJames also asserted that the District violated "the applicable standard of care" by placing K.F. on Greenline warning rather than on Greenline watch. However, Mr. DeJames never testified with any specificity that the standard of care he had in mind was used by other facilities comparable to the Receiving Home or based on some nationally recognized standard.[3] Mr. DeJames' testimony was similar to that of the experts in *Carmichael* and *Moreno* in that "he did not identify, or even mention in passing, any specific standard or regulation.... [n]or did he make any comparisons to other similar facilities." *Moreno, supra,* 647 A.2d at 400. His testimony thus "failed to establish any standard of care, and therefore failed to demonstrate how the District of Columbia deviated from the standard of care." *Id.* at 399. Because Mr. DeJames' testimony amounted to no more than his personal opinion, or at best an unsupported assertion as to the national standard of care, it was insufficient to survive a motion for directed verdict. *See Messina, supra,* 663 A.2d at 538–40; *Moreno, supra,* 647 A.2d at 399–401; *Carmichael, supra,* 577 A.2d at 314–16; *Toy, supra,* 549 A.2d at 7–8.

■ Appellant argues that even if Mr. DeJames' testimony was insufficient to establish a national standard of care, directed verdict was still improper because there was evidence that the District had violated its own Suicide Prevention Plan by placing K.F. on Greenline warning instead of Greenline

**3.** The most that Mr. DeJames did, and then only on cross-examination, was to refer to an American Correctional Association standard with which he was not familiar and did not utilize and to assert that two levels of checks, one fifteen minutes and one constant watch if the juvenile reached a certain unstated level of suicidal behavior, would be consistent with most standards nationally, but with no indication how such levels are generally defined and applied in practice.

watch status.[4] "To prevail on a negligence *per se* theory, the plaintiff may, in certain circumstances and under specified conditions ... rely on a statute or regulation as proof of the applicable standard of care." *McNeil Pharm. v. Hawkins,* 686 A.2d 567, 578 (D.C. 1996). As appellant acknowledges in her reply brief, however, the Suicide Prevention Plan is neither a statute nor a regulation, but simply an unpublished internal agency procedure.[5] *See Abney v. District of Columbia,* 580 A.2d 1036, 1040–41 (D.C.1990) (noting that an unpublished Metropolitan Police Department General Order was the equivalent of an "internal operating manual" and not a "rule" or regulation). We have noted in another context that "[a]gency protocols and procedures, like agency manuals, do not have the force or effect of a statute or an administrative regulation," but rather "they provide officials with guidance on how they should perform those duties which are mandated by statute or regulation." *Wanzer v. District of Columbia,* 580 A.2d 127, 133 (D.C.1990). Because the Suicide Prevention Plan is only an unpublished internal agency procedure and not a statute or regulation, it cannot embody the standard of care under a negligence *per se* theory. *Kugel v. United States,* 292 U.S.App. D.C. 135, 138–39, 947 F.2d 1504, 1507–08 (1991); *Jacobo v. United States,* 853 F.2d 640, 641–42 (9th Cir.1988) (per curiam) (cited in *Wanzer, supra* ). To hold otherwise would create the perverse incentive for the District to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions.[6]

The Suicide Prevention Plan may well have been admissible as *bearing on the* standard of care, as the internal rules of private corporations generally are. *See* 1 J.D. LEE AND BARRY A. LINDAHL, MODERN TORT LAW § 3.29 (1996) ("Company rules are generally admissible but not conclusive on the question of the standard of care."); 3 FOWLER V. HARPER ET AL., THE LAW OF TORTS § 17.3, at 587–88 (2d ed.1996) (same); *cf. Thoma v. Kettler Bros.,* 632 A.2d 725, 729–30 (D.C.1993) (holding that OSHA regulations of nationwide scope which did not give rise to negligence *per se* were nevertheless admissible as evidence of the standard of care). However, the admission of the Suicide Plan alone would not be sufficient to overcome a motion for directed verdict because expert testimony was still required to establish that the Plan, and more particularly that portion of it that was claimed to be violated, here, the Greenline status, see note 4 *supra,* embodied the national standard of care and not a higher, more demanding one. The District cannot be held liable for aspiring to efforts beyond an applicable national standard. *See Garri-*

4. There was also some evidence that the District violated the Suicide Prevention Plan by monitoring K.F. at regular instead of random intervals and in not providing a suicide-proof room. At oral argument, however, appellant's counsel indicated that the only theory of liability he intended to rely on was that based upon the allegedly negligent assignment of K.F. to Greenline warning instead of Greenline watch, with its requirement of continual in-line-of-sight observability. In any event, a claim based on the lack of random monitoring or a suicide-proof room would fail for essentially the same reasons as one based on the incorrect monitoring status. Even with respect to such claims, the closest appellant's expert appears to have come to specificity was to refer to his employment experience in New Jersey, which he said has one of the lowest suicide rates in the nation for confined juveniles.

5. Appellant's argument that the Suicide Prevention Plan, embodied the standard of care because it was adopted pursuant to court order in the *Jerry M.* litigation, *see generally District of Colum-*

*bia v. Jerry M.,* 580 A.2d 1270, 1272–73 (D.C. 1990); *District of Columbia v. Jerry M.,* 571 A.2d 178, 180–83 (D.C.1990), was not raised on appeal until oral argument and we therefore do not consider it, *see Atkins v. Industrial Telecomm. Ass'n,* 660 A.2d 885, 894 n. 18 (D.C.1995). In any event, appellant has cited no authority for the proposition that an internal agency procedure such as this one should be treated differently because its creation was motivated by court order as opposed to some other reason. Moreover, the District asserts that the court order required only that the Plan incorporate not less than the national standard and that the Plan in fact exceeded that requirement.

6. When asked whether any institution in the United States had a better suicide prevention plan than the District's, the expert said he did not know. He also indicated that he thought the District exceeded the national standard of care by providing for a full-time physician, full-time psychiatrist and in-house counsel.

son v. D.C. Transit System, Inc., 196 A.2d 924, 925 (D.C.1964) (noting that an employer's rules were "not conclusive" evidence of negligence but only "some indication of the care required under the circumstances"). See also United States v. Caceres, 440 U.S. 741, 755–56, 99 S.Ct. 1465, 1473–74, 59 L.Ed.2d 733 (1979) (noting in context of internal I.R.S. regulations governing electronic surveillance that "we cannot ignore the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures"). In essence, plaintiff's case here is based upon the proposition that the District deviated from its own Plan. That is simply not enough.

Affirmed.[7]

---

**7.** Appellant also contends that the trial court erred in excluding two of her expert witnesses and allowing one of the District's witnesses to testify as an expert. We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *District of Columbia v. Anderson*, 597 A.2d 1295, 1299 (D.C.1991). Here the trial court excluded the testimony of two of appellant's experts because they had not been timely designated pursuant to Super. Ct. Civ. R. 26(b)(4) and their reports were not timely filed. Appellant was not prejudiced by the exclusion of these experts because they only would have testified about damages on the negligence count. We find no basis for reversal on this ground. The trial court also allowed Dr. Joel Gantz, a Receiving Home psychiatrist, to testify as an expert for the District despite the fact that he had not been designated as an expert pursuant to Super. Ct. Civ. R. 26(b)(4). Any error in this regard would be irrelevant in light of our opinion on the directed verdict issue. Appellant's motion for a new trial was likewise properly denied.